### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| *LIBERTY SCARBOROUGH,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 07-193-P-S* |
| | ) | |
| *NESTLE WATERS NORTH AMERICA* | ) | |
| *INC.* | ) | |
| | ) | |
| *Defendant* | ) | |

### RECOMMENDED DECISION ON MOTION FOR PARTIAL SUMMARY JUDGMENT

The defendant, Nestle Waters North America Inc., moves for summary judgment on the plaintiff's claim of constructive discharge and on Count II of her complaint, which alleges unlawful retaliation in this employment sexual harassment case.  I recommend that the court grant the motion.

### I.  Summary Judgment Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*,  532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).

"A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with

an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II. Factual Background

The following undisputed material facts are appropriately presented in the parties' respective statements of material facts filed in accordance with this court's Local Rule 56.

The defendant owns and operates a plant in Poland Spring, Maine, at which it bottles water for distribution and sale. Defendant's Statement of Undisputed Material Facts ("Defendant's SMF") (Docket No. 25) ¶ 1; Plaintiff's Response to Defendant's Statement of Material Facts ("Plaintiff's Responsive SMF") (Docket No. 46) ¶ 1. The plant has 12 production lines on which employees fill different sizes and types of bottles. *Id.* ¶ 2. The plaintiff worked at the plant from March 2, 2005, until June 21, 2006, as a filler operator. *Id.* ¶ 3. In the fall of 2005, she began working as a filler operator on the D shift, which is one of two night shifts that alternate between three and four nights per week, from 6:00 p.m. to 6:00 a.m. *Id.* ¶ 4. On the D shift, she worked on line 11 for about 5 months, then moved to line 1 where she worked until she resigned in June. *Id.* ¶ 5.

Jeffrey "Scott" Pettengill began his employment at the plant on March 25, 2004. *Id.* ¶ 6. He became a filler operator and worked on the D shift on line 12 in 2005. *Id.* ¶ 7. During the fall of 2005, the plaintiff and Pettengill worked next to each other on lines 11 and 12 respectively. *Id.* ¶ 8. In December 2005, Pettengill bid for and was selected for the job of palletizer operator, in which he would operate a forklift in the warehouse area of the plant, which is hundreds of feet away from the production lines, and also between the end of the production lines and the warehouse, where he would transport the finished product as it came off the lines. *Id.* ¶¶ 9-10. As a palletizer operator, Pettengill did not have any duties that required him to interact with the plaintiff. *Id.* ¶ 12.

In late 2005, the plaintiff told one of her supervisors, Bill Brooks, that Pettengill stared at her during work hours and had followed her to a Dunkin Donuts after work. Plaintiff's Additional Statement of Material Facts ("Plaintiff's SMF") (included in Plaintiff's Responsive SMF, beginning at 24) ¶ 107; Defendant's Reply Statement of Material Facts ("Defendant's

4

Responsive SMF") (Docket No. 73) ¶ 107.  The defendant's sexual harassment policy required Brooks to inform Human Resources of the plaintiff's complaint so that the latter could conduct an investigation and initiate remedial action.  *Id.* ¶ 108.  Brooks did not report the plaintiff's complaints about Pettengill to Human Resources.  *Id.* ¶ 109.[1]  On a later occasion, the plaintiff told her supervisor, Mr. Kidd, that she believed that Pettengill was sexually harassing her and had failed to tell her that Kidd wanted her to continue to fill bottles until 5:20 that day, thereby causing her to shut off the water on her line at 5:00 in accordance with her usual practice, such that bottles would continue to come down the line but could not be filled.  *Id.* ¶ 121.[2]  Thereafter, when Pettengill was the team leader on the plaintiff's line, if she asked him for assistance, her would tell her that it was not his "fucking" job and walk away.  *Id.* ¶¶ 123, 126.  Pettengill refused to supply the plaintiff with materials and periodically refused to help her during the entire period that he was the team leader on her line.  *Id.* ¶ 127.

In January 2006, Pettengill bid for and was selected for the job of Utility for lines 1 and 2. Defendant's SMF ¶ 13; Plaintiff's Responsive SMF ¶ 13.   His responsibilities included helping the production lines when needed, filling in for employees on those lines when they went on break, delivering supplies to the lines by forklift and hauling away trash from the lines.  *Id.* ¶ 14.   As a Utility, Pettengill had opportunities to interact with the plaintiff while performing his duties, particularly when she moved from line 11 to line 1 in March 2006.  *Id.* ¶ 15.  On April 22, 2006, the plaintiff complained to Kidd that she had been subjected to sexual harassment by

---

[1] The defendant asserts that this paragraph of the plaintiff's statement of material facts should be stricken as irrelevant to the claims on which the defendant seeks summary judgment.  Defendant's Responsive SMF ¶ 109.  The information in the paragraph is relevant background material.  The request to strike the paragraph is denied.

[2] The defendant asserts that this paragraph of the plaintiff's statement of material facts should be stricken as irrelevant to the claims on which the defendant seeks summary judgment.  Defendant's Responsive SMF ¶ 121.  For the reasons stated in footnote 1, this request to strike is denied.

Pettengill.  *Id.* ¶ 16.  Kidd immediately reported her complaint to Jennifer Watkins, then the Manager of Human Resources at the plant.  *Id.* ¶ 17.

Watkins began an investigation on the same evening that Kidd informed her of the plaintiff's harassment complaint.  *Id.* ¶ 18.  She called the plaintiff to her office for an interview, during which the plaintiff provided information about her complaint against Pettengill.  *Id.* ¶ 19.  She asked the plaintiff to write a statement, which the plaintiff provided.  Plaintiff's SMF ¶ 128; Defendant's Responsive SMF ¶ 128.  Watkins also took notes about what the plaintiff told her.  *Id.* ¶ 129.  She then interviewed Pettengill that same evening.  Defendant's SMF ¶ 20; Plaintiff's Responsive SMF ¶ 20.  After conducting further investigation, Watkins suspended Pettengill that night.  *Id.* ¶ 21.  Over the next several days, Watkins completed her investigation by interviewing other members of the D shift crew, and she consulted with production manager Cameron Lorrain.  *Id.* ¶ 22.

Watkins reported to Lorrain that, based on her investigation, she had concluded that the plaintiff and Pettengill had engaged in a consensual, flirtatious relationship that included sexual talk and conduct; that the plaintiff sought to end the relationship after a period of time; that Pettengill had nonetheless continued to engage in sexual talk and other behavior; that employees on the D shift other than the plaintiff and Pettengill also engaged in sexual talk and joking on a regular basis; and that Pettengill had performed poorly as a Utility by failing to be appropriately helpful and responsive to the needs of other crew members.  *Id.* ¶ 23.  She also found that Pettengill had sexually harassed the plaintiff and created a hostile work environment for her.  Plaintiff's SMF ¶ 131; Defendant's Responsive SMF ¶ 131.

Watkins and Lorrain decided to suspend Pettengill without pay, demote him from his Utility job and return him to the palletizer operator job, and reduce his pay to its previous level.

Defendant's SMF ¶ 24; Plaintiff's Responsive SMF ¶ 24.[3]  Watkins and Lorrain each instructed Pettenfill to have no contact with the plaintiff and not to engage in any behavior that could be considered harassing or retaliatory.[4]  Kidd told the plaintiff not to talk to Pettengill about anything except business.  *Id*. ¶ 26.  In his role as palletizer operator, Pettengill again had no need to interact with the plaintiff in the performance of any of his job functions.  *Id*. ¶ 28.

On June 7, 2006, the plaintiff reported to Watkins that she was upset about Pettengill's behavior.  *Id*. ¶ 30.  She reported that, some time earlier, while they were both in line at the time clock to punch in, Pettengill had said to her, "That's okay, I didn't want to be a fucking Utility anyway."  *Id*. ¶ 31.  The plaintiff was so upset by this remark that she left work.  Plaintiff's SMF ¶ 139; Defendant's Responsive SMF ¶ 139.  Before she left, she reported the comment to Brooks and told him that she had to leave.  *Id*. ¶ 140.  She also reported to Watkins on June 7 that, on another occasion in the past, she had gone into the break room to get coffee, and  Pettengill, who was seated with a group of employees, stated, in reference to a woman who appeared on the

---

[3] The plaintiff qualifies this paragraph of the defendant's statement of material facts in part and denies it in part. Plaintiff's Responsive SMF ¶ 24.  I have omitted the portions of the paragraph which the plaintiff has denied.  She has also moved to strike a paragraph of the affidavit of Barbara Streams (Docket No. 28) that is cited by the defendant in support of this paragraph of its statement of material facts, on the grounds that "[t]he exhibits referenced in Ms. Streams' affidavit do not support the statement in paragraph 9 of the affidavit."  Plaintiff's Responsive SMF ¶ 24 at 8.  I conclude that those documents do support paragraph 9 of the affidavit, and, furthermore, the appropriate action by the plaintiff would be to ask the court to strike the portions of paragraph 24 of the statement of material facts which are supported by paragraph 9 of the affidavit, not to strike that paragraph of the underlying affidavit.  The request to strike is denied.

[4] The plaintiff, while acknowledging that she does not have any evidence to refute the sworn statements of Watkins and Lorrain to this effect, asserts that the court should nonetheless "not consider [them] to be true because a jury would not be required to believe [them]," citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  Plaintiff's Responsive SMF ¶ 25.  The language cited by the plaintiff from *Reeves* involves the appropriate method of evaluating a motion for judgment as a matter of law, which is made only after a plaintiff has completed the submission of evidence at trial.  The Court's citation of 9A C. Wright & A. Miller, *Federal Practice & Procedure* § 2529 (2d ed. 1995), 530 U.S. at 150, 151, makes this clear.  That section deals only with motions made under Fed. R. Civ. P. 50 during trial.  While the Court also said that the Rule 50 process "mirrors" the standard for granting summary judgment, *id.* at 150, the plaintiff takes this observation too far.  Used as the plaintiff would have it, this standard would essentially allow a plaintiff to avoid seeking available evidence on a particular point, by saying, in essence, "I can't controvert it, but the court may not consider it, because the jury would not have to believe the affiant" whose sworn statement supports the fact.  This would render it impossible for the court to enter summary judgment in most, if not all, cases.  The statements at issue here, from Watkins and Lorrain about what they told Pettengill, are certainly capable of being controverted, and fairly easily, as Pettengill has been deposed in this case.  The plaintiff cannot forebear asking Pettengill the obvious question and then rely on the lack of such information to avoid the entry of summary judgment.

television set in the break room, "I can't say what I want to say because the heat is in the room." Defendant's SMF ¶ 32; Plaintiff's Responsive SMF ¶ 32.  The plaintiff told Watkins that she would see Pettengill in the distance, and he would scowl or glare at her, at least once or twice a day.  *Id*. ¶ 33.  She also told Watkins that her new supervisor, Tom Koczkodan, had told her that he had "heard all about you" and that he had to be "careful" because of her harassment complaint against Pettengill.  *Id*. ¶ 34.  She also told Watkins that she had heard through the grapevine that Pettengill was telling people that the two of them had had a relationship, and that was why the plaintiff was telling people that he was harassing her.  *Id*. ¶ 35. When Watkins asked her what would make her more comfortable in the workplace, the plaintiff told Watkins that it would make her more comfortable not to have to work with or be around Pettengill.  *Id*. ¶¶ 71-72. Watkins acted very coldly toward the plaintiff during this meeting.  Plaintiff's SMF ¶ 148; Defendant's Responsive SMF ¶ 148.  She told the plaintiff that she would speak to Koczkodan about the plaintiff's concerns, but she did not do so.  *Id*. ¶ 149.

That same night, Watkins told the night supervisors, Keith Proteau and Koczkodan, to suspend Pettengill immediately, which they did.  Defendant's SMF ¶ 36; Plaintiff's Responsive SMF ¶ 36.  Within the next several days, Watkins conferred with Lorrain, and they decided that Pettengill should be terminated.  *Id*. ¶ 37.  A supervisor, Gary Kennison, called Pettengill at home and told him he was being terminated.  *Id*. ¶ 38.  On June 15 or 16, 2006, the plaintiff told Koczkodan that she was considering resigning.  *Id*. ¶ 39.  On June 16, 2006, Pettengill submitted a written appeal of his termination.  *Id*. ¶ 45.  On June 26, 2006, Lorrain and Watkins met with Pettengill and, after reviewing his appeal and talking to him, decided to reduce his punishment to a two-week unpaid suspension and to reinstate him to his job as a palletizer operator.  *Id*. ¶ 46. During this conversation, Pettengill told Lorrain that he had made the comment the plaintiff had

attributed to him about not wanting to be a Utility any more, but that he did so only after the plaintiff made a comment to him to the effect that "I got you removed from your Utility job." *Id.* ¶ 47. He denied making the comment about the "heat" being in the room. *Id.* ¶ 48.

Watkins informed Lorrain that she had been unable to corroborate any aspect of the plaintiff's complaint about retaliation other than the "Utility" comment. *Id.* ¶ 50.[5] They concluded that even if what the plaintiff had said was true, it did not rise to the level of retaliation that would merit termination. *Id.* ¶ 51.[6] On the evening of June 21, 2006, Watkins had the plaintiff brought to her office to conduct an exit interview and to inform the plaintiff that Pettengill would be returning to work. *Id.* ¶ 52.[7] The plaintiff left the plant on the evening of June 21 and did not return to her job. *Id.* ¶ 56. From the time Pettengill returned to work from his first suspension through June 21, 2006, the plaintiff did not have to work with Pettengill in order to perform her job, rely on him to perform her job, or communicate with him in order to perform her job.[8]

The plaintiff sought several jobs at the plant for which she was not selected: a CIP position, a quality assurance position, and a Globe position. *Id.* ¶ 76. She learned that she had

---

[5] The plaintiff makes the same objection to paragraph 50 of the defendant's statement of material facts that she made to paragraph 25. Plaintiff's Responsive SMF ¶ 50. This objection is overruled for the same reasons as is footnote 4.
[6] The plaintiff makes the same objection to paragraph 51 of the defendant's statement of material facts that she made to paragraph 25. Plaintiff's Responsive SMF ¶ 51. This objection is overruled for the same reasons.
[7] The parties disagree about whether Watkins intended during this meeting to outline the measures the company would take to make sure the plaintiff had no contact with Pettengill while she worked out her notice. Defendant's SMF ¶ 52; Plaintiff's Responsive SMF ¶ 52. They agree that Watkins did not actually do this during the meeting, but the defendant contends that this was the result of the plaintiff's walking out of the interview upon learning that Pettengill would be returning, Defendant's SMF ¶ 54, while the plaintiff contends that she "gave Ms. Watkins a chance to explain any alleged steps that the company planned to take in order to keep her and Mr. Pettengill apart." Plaintiff's Responsive SMF ¶ 54.
[8] The plaintiff denies this paragraph of the defendant's statement of material facts with the statement that "Ms. Scarborough had to work at the same time and in the same facility as Mr. Pettengill during this period." Plaintiff's Responsive SMF ¶ 73. This denial is not responsive to the defendant's statement. In addition, in the absence of any evidence of the size of the plant, the distance between Pettengill's work area and that of the plaintiff, and any specific opportunities for their paths to cross inherent in working "at the same time," the plaintiff's response, essentially a claim that she was entitled to have Pettengill fired as a matter of law, is insufficient to allow a reasonable factfinder to draw the conclusion she proffers.

9

not been selected for one of the Globe positions shortly before she resigned in June 2006. Plaintiff's SMF ¶ 160; Defendant's Responsive SMF ¶ 160.  The defendant contends that the plaintiff did not apply for this position because the positions were not applied for.  *Id.* ¶ 163; *see also* Defendant's Responsive SMF ¶ 162.  The plaintiff applied for a CIP operator position in April 2006 and was not interviewed or hired for the job.  *Id.* ¶ 164.

Pettengill's annual performance evaluation for the period of October 2005 to October 2006 did not mention any discipline that he received in connection with the plaintiff's complaint. *Id.* ¶¶ 172-73.

### III.  Discussion

### A.  Retaliation

The complaint alleges sexual harassment and unlawful retaliation in two counts. Complaint (Docket No. 1) ¶¶ 13-20.  The defendant's motion addresses paragraph 11 of the complaint, which alleges that the plaintiff was forced to resign her employment with the defendant "because of the ongoing harassment and retaliation she was experiencing," and Count Two, which alleges that the defendant retaliated against the plaintiff "because she complained about sexual harassment."  Count Two invokes both Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. § 4551 *et seq.*

To establish a claim of retaliation, a plaintiff must show (1) that she undertook protected conduct, (2) she suffered an adverse employment action, and (3) the two were causally linked. *Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006).

> To prevail on a claim of retaliation in violation of Title VII, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Billings v. Town of Grafton*, 515 F.3d 39, 52 (1st Cir. 2008) (citation and internal quotation marks omitted). There is no material difference between federal and state law on the retaliation claim, and I will therefore consider them both under this legal standard. *Gavrilovic v. Worldwide Language Res., Inc.*, 441 F.Supp.2d 163, 177 (D. Me. 2006).

> Trivial actions such as petty slights, minor annoyances, and simple lack of good manners will not normally create such deterrence. Context matters, and the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint.

*Carmona-Rivera*, 464 F.3d at 20 (citations and internal punctuation omitted).

The defendant first argues that the plaintiff's retaliation claim fails as a matter of law because she cannot show that she was subjected to materially adverse employment actions that would dissuade a reasonable worker from bringing a complaint of harassment against a coworker. Defendant's Motion for Partial Summary Judgment ("Motion") (Docket No. 24) at 7.

The plaintiff identifies the following as "some" of the retaliatory actions at issue, all of which were apparently inflicted by Pettengill:

> Mr. Pettengill followed Ms. Scarborough to Dunkin Donuts after she refused to have sex with him in the woods in order to frighten her. He patted her butt with his hat after she told him not to pat it with his hand. He refused to assist Ms. Scarborough even though his job as a Team Leader required him to do so. He withheld information from Ms. Scarborough about when the bottle feeder would shut off on her line in order to get her in trouble. He made retaliatory comments in the breakroom and timecard line after the HR investigation in order to indicate to her co-workers that she was the one who had complained about him. He glared at her whenever he saw her after the HR investigation. He also spread rumors that he and Ms. Scarborough had engaged in a sexual relationship.

Opposition at 17-18. "[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." *Noviello v. City of Boston*, 398 F.3d 76, 89 (1st

Cir. 2005). The plaintiff acknowledges, *id.* at 18, that an employer may be held liable for harassment inflicted by a co-worker only if the employer knew or should have known of the harassment and failed to take prompt and appropriate action.[9]  *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002).  She asserts that she "informed the Defendant of Mr. Pettengill's sexual and retaliatory harassment when she complained to supervisors and management. . . in late 2005, February 2006, April 2006, and in late April or early May 2006[.]"  Plaintiff's Response to Defendant's Motion for Partial Summary Judgment ("Opposition") (Docket No. 45) at 18.

The defendant bases its argument in response on an assertion that it was not informed of any alleged harassment of the plaintiff by Pettengill until April 22, 2006, when the plaintiff met with Watkins.  Defendant's Reply Memorandum in Support of Its Motion for Partial Summary Judgment ("Reply") (Docket No. 72) at 1.  I assume that the plaintiff's reference to "late 2005" is to her alleged complaint to a supervisor, Bill Brooks, about Pettengill's "sexual comments and inappropriate touching . . . [and] the incident when Mr. Pettengill followed her to Dunkin Donuts."  Opposition at 4; Plaintiff's SMF ¶¶ 107-09.[10]  The defendant denies that the plaintiff told Brooks anything other than that Pettengill "was staring at her and following her home from work," Defendant's Responsive SMF ¶ 107, but admits that Brooks did not convey whatever the plaintiff told him to the Human Resources Department.  For purposes of summary judgment, I

---

[9] Yet the plaintiff also contends that she "engaged in protected activity when she told Mr. Pettengill to stop sexually harassing her."  Opposition at 17.  This argument would make an employer liable for a co-worker's harassment of which it has no knowledge.  The authority cited by the plaintiff does not support her contention.  In *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000), the alleged harasser was the plaintiff's supervisor, not a co-worker. The quotation from the EEOC Compliance Manual, also cited by the plaintiff, Opposition at 17, simply makes a complaint that the plaintiff may have made to Pettengill (that she perceived his actions to be unlawful employment discrimination) into an act of opposition to that discrimination under applicable law.  It does not and cannot make subsequent actions by Pettengill or by the defendant into retaliation for that act of opposition unless and until the defendant was aware of that act of opposition.

[10] The defendant asserts that this paragraph of the plaintiff's statement of material facts should be stricken because it is "[n]ot relevant to the claims on which Defendant seeks summary judgment."  Defendant's Responsive SMF ¶ 109.  However, the question of when the defendant was first notified of the plaintiff's allegations about Pettengill is very relevant to her claim of unlawful retaliation.

must credit the plaintiff's account.  For that purpose, the only possible conclusion is that the defendant should have known about Pettengill's sexual comments and inappropriate touching as of late 2005.

The question thus becomes whether the harassment that the plaintiff alleges she suffered at Pettengill's hands between late 2005 and April 22, 2006, when the defendant acknowledges that it was put on notice of Pettengill's alleged activity, was sufficient to be "materially adverse from an objective perspective" to constitute a change in the terms and conditions of the plaintiff's employment.  *Nolan v. Swartz Campbell, LLC*, 2008 WL 598291 (W.D.Pa. Feb. 29, 2008), at *22-23.

With respect to this period, the plaintiff offers the following: (1) the general assertion that Pettengill "sexually harassed [her] and retaliated against her for opposing his sexual harassment on a regular basis from the time that they began working with each other in the fall of 2005 until April of 2006," Plaintiff's SMF ¶106; (2) that Pettengill told the plaintiff that he would help her more in his role as a Utility if she had sex with him, *id.* ¶ 104;  that he made comments to her "such as 'you could have had me wrapped around your little finger,'" *id.* ¶ 113; that Pettengill once deliberately failed to inform the plaintiff that she needed to keep her line operating until 5:20 in order to get her into trouble and "said to her in a nasty tone 'you could have helped me out in the past, and I would have helped you,'" *id.* ¶¶ 114-20; that Pettengill "would unnecessarily make [her] wait for caps and glue when she needed them for her line," and told her that "he was her boss and she had to do what he said," but when she asked for help, "he would tell her that it was not his 'fucking' job and walk away," *id.* ¶¶ 124-26.

The defendant disputes much of this information, Defendant's Responsive SMF ¶¶ 104, 106, 113-15, 118-20, 124, but I am required to credit it for purposes of the summary judgment

motion.  However, in the summary judgment context, a court is not required to credit conclusory assertions, *Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90, 94 (1st Cir. 2004), and for that reason I need not consider paragraph 106 of the plaintiff's statement of material facts. While the alleged remark offering help in exchange for sex causes me concern, the remaining specific allegations, considered separately or together, do not rise to the baseline level of a hostile work environment nor of an adverse employment action generally because they do not demonstrate how, if at all, the alleged conduct interfered with the plaintiff's performance of her work.  *See Lufkin v. Eastern Maine Med. Ctr.*, 2006 WL 1892442 (D. Me. July 7, 2006), at *14. She does not suggest that the bottle incident or the lack of caps and glue had any effect on the adequacy of her performance from the defendant's point of view or in any objective sense.

The same is true of the remaining specific factual allegations of harassment by Pettengill that occurred after April 22, 2006, the allegedly retaliatory comments in the break room and time card line, glaring at the plaintiff whenever he saw her, and spreading a rumor that he had had a sexual relationship with the plaintiff,.  The comments and the spreading of the rumor are certainly offensive, but, like the glaring, do not rise about the level of "petty slights, minor annoyances, and simple lack of good manners," *Carmona-Rivera*, 464 F.3d at 20, which would not normally deter a reasonable employee from filing a complaint of harassment based on sex.

The plaintiff next contends that the defendant retaliated against her for her report on April 22, 2006 by "refus[ing] to hire, or even interview, her for positions on which she bid." Opposition at 19.  As she acknowledges, *id.*, this contention requires evidence that she applied for particular positions for which she was qualified.  *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006).  The plaintiff includes the globe position, CIP operator position, and quality assurance position within the group of positions "on which she bid[,]"  but which she was not

14

awarded.  Opposition at 19-21.  But, the only evidence she proffers to demonstrate that she was qualified for the position of CIP operator and the quality assurance position is her own assertion. *Id.* at 13; Plaintiff's Responsive SMF ¶ 79.[11]  In the absence of any indication of what the qualifications for those two positions were, the plaintiff's conclusory assertion that she was qualified for them is insufficient.  *Roger Edwards*, 387 F.3d at 94.

The plaintiff cites the deposition of Kidd for the proposition that she was qualified for the globe position, but all that Kidd testified to at the cited pages was the following:

> Q.  Did you write her a letter of recommendation for [the globe] position?
> A.  No, I did not.  I wasn't her direct supervisor.  If I remember correctly, they asked me if I thought she could do the position and I said yeah, I think she can[.]
>
> * * *
>
> Q.  Who contacted you to ask about whether she would be good for that position?
> A.  I think it was HR or – it was either HR or Jen.  I can't remember now.
>
> * * *
>
> Q.  And so you reported back to HR that you thought that Miss Scarborough would be good for the position?
> A.  I thought she could do it, yes.

Deposition of: Maurice Kidd ("Kidd Dep.") (Docket No. 32) at 47-48.  This lukewarm endorsement applies only to the globe position.  Assuming *arguendo* that the sketchy evidence beyond her own assertion that she was qualified for the globe position is sufficient to establish that portion of the applicable legal test for purposes of summary judgment, the plaintiff again offers only her own testimony that others were interviewed for the position while she was not. Plaintiff's SMF ¶ 159.  The defendant denies that anyone was interviewed for this position, Defendant's Responsive SMF ¶ 159, but the court must credit the plaintiff's evidence on this

---

[11] The preferable practice for a party opposing summary judgment to add evidence to the summary judgment record is for that party to include that evidence in its own statement of material facts, not merely in its response to a paragraph in the moving party's statement of material facts, so that the moving party may have a procedural opportunity to respond to the new factual material.

point, because it is not the kind of conclusory offering that the plaintiff made with respect to the other two positions.

Because the plaintiff does not attempt to show that she was as qualified as the employees who were given the temporary globe positions,[12] I will focus first on the question whether a failure to interview an employee for another position may constitute adverse employment action for purposes of a Title VII claim. Available case law suggests that it is. *E.g., Carter v. Snow*, 2007 WL 2156618 (S.D.Tex. July 26, 2007), at *1, *3; *Fair v. Arkansas Pub. Employees Retirement Sys.*, 2006 WL 3210009 (E.D. Ark. Nov. 6, 2006), at *4, *6. *But See Gaston v. United States Postal Serv.*, 2008 WL 2682850 (D.N.J. July 2, 2008), at *3 (refusal to interview plaintiff for jobs for which he may or may not have been qualified after he complained about employment discrimination and entered into settlement agreement promising interviews for jobs for which he was qualified, does not state claim for retaliation).

For the element of causation, the plaintiff relies on the two-month period between April 22, 2006 and her resignation on June 21, 2006, and what she characterizes as evidence of pretext: the testimony of Brooks and Kidd that she applied for the position when Lorrain asserts that no one applied for the position. Opposition at 20. The reliance on temporal proximity is complicated by the fact that the plaintiff asserts only that the defendant "made a decision to hire someone other than Ms. Scarborough for a Globe position before she resigned on June 21, 2006." *Id.* She does not tell the court when the interviews, from which she alleges she was excluded, took place. As I have already noted, it is the failure to interview that is at issue, not the hiring of anyone else for the position. The plaintiff does state that she applied for the globe

---

[12] The plaintiff does cite to Kidd's deposition testimony on this point, Plaintiff's SMF ¶ 158, Kidd Dep. at 48, but does not establish a foundation for that testimony that would allow a reasonable factfinder to draw the inference that Kidd's knowledge of the requirements of the position and his knowledge of the qualifications of the four or five people who were given the jobs was sufficient to allow him to testify as to his opinion.

position "shortly before" she made her April 22 complaint, *id*. at 12, but that does not establish when the alleged interviews were held.  Plaintiff's SMF ¶ 153.  On the showing made, the interviews could have been held "shortly before" April 22, in which case her April 22 complaint could not have caused the failure to interview.  The plaintiff says that she "learned" that she had not been selected for a globe position "shortly before she resigned," *id*. ¶ 160, but again, this paragraph does not reveal when the interviews about which the plaintiff complains were held. Without that information, she cannot establish either end of the temporal proximity on which she relies.

I therefore move on to the plaintiff's contention that evidence of pretext suffices to demonstrate the necessary causal connection.  She cites *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000), for this proposition.  The First Circuit has said that "[a]n employer's different and arguably inconsistent explanations for its challenged employment action can serve as evidence of pretext," *Billings*, 515 F.3d at 56, but not that this can also serve as evidence of a causal connection between protected activity and an adverse employment action. Here, the "evidence" on which the plaintiff relies is the fact that two supervisors, Brooks and Kidd, "recall that Ms. Scarborough applied for a Globe position" while Lorrain, who chose the individuals to fill the positions, testified that no one applied for the positions.  Opposition at 20; Plaintiff's SMF ¶¶ 162-63, Defendant's Responsive SMF ¶¶ 162-63.   However, even if the First Circuit were to adopt the Third Circuit's position in *Farrell*, the testimony of Brooks and Kidd, two lower-level supervisors, and that of Lorrain, the decision-maker, differ on the question of whether the plaintiff *applied* for the globe position.   This is not the defendant's sole "explanation[] for its challenged employment action," because the defendant also gives as its reason for not interviewing the plaintiff that she lacked qualifications, experience, and seniority,

which were the bases for choosing employees for temporary assignments to the globe positions. Defendant's Responsive SMF ¶¶ 157, 159.  The plaintiff's conclusory opinion that she was qualified for the globe position, and the similar opinion of Kidd, do not address her experience or seniority in comparison to those who were selected for the positions.  The fact that Brooks and Kidd believe, somewhat tentatively, *see* Kidd Dep. at 47[13] & Deposition of William E. Brooks, III ("Brooks Dep.") (Docket No. 47) at 85[14] (cited as authority for paragraph 162 of the plaintiff's statement of material facts), that the plaintiff applied for the positions, and Lorrain, who chose the employees for the globe positions, believes that no one applied, Defendant's Responsive SMF ¶ 159; Affidavit (2) of Cameron Lorrain (Docket No. 72) ¶ 5, would not allow a reasonable factfinder to conclude that Lorrain must be lying about whether the chosen employees had more qualifications, experience, and seniority than the plaintiff, who at the time of her resignation had been working for the defendant for a total of only 15 months.  Defendant's SMF ¶ 3; Plaintiff's Responsive SMF ¶ 3.

The plaintiff offers no other evidence of the necessary causal connection. For the foregoing reasons, therefore, I recommend that the defendant's motion for summary judgment be granted.

## B.  Constructive Discharge

Paragraph 11 of the complaint reads as follows: "On June 21, 2006, Ms. Scarborough was forced to resign from Nestle because of the ongoing harassment and retaliation she was experiencing.  Her resignation was a constructive discharge."  Complaint, ¶ 11.  The defendant

---

[13] "Q.  Were you aware of Liberty Scarborough applying for a globe position?  A.  I think I heard something about her applying for a globe position, yes.  Q.  How did you hear that?  A.  I can't remember now.  I think I was asked if she could do the position or something like that."  Kidd. Dep. at 47.  This testimony is actually consistent with Lorrain's assertion that no one applied for the positions and that he asked some supervisors about possible candidates.

[14] "Q.  Do you know whether Liberty applied for one of those globe positions?  A.  Won't swear to it but I think I remember seeing her name on a job bid."  Brooks Dep. at 85.

contends that this claim must fail as a matter of law because the plaintiff cannot show that the working conditions at the time of her resignation were so difficult or unpleasant that a reasonable person in her position would have felt compelled to resign. Motion at 11-12. The plaintiff responds that this is a factual issue that must go to trial, Opposition at 22, and, apparently in the alternative, that she was subjected to "severe sexual and retaliatory harassment" "[f]or almost the entire time" she worked for the defendant, resulting in humiliation and alienation that forced her to resign. *Id*. at 22-25.[15]

The plaintiff's suggestion that the issue of constructive discharge may never be resolved on summary judgment is simply wrong.[16] In *Billings*, the only authority cited by the plaintiff in support of this proposition, *id*. at 22, immediately after the language quoted by the plaintiff, the First Circuit said:

> We do not mean, of course, that hostile environment cases inevitably raise issues that cannot be resolved by summary judgment, which remains an appropriate vehicle for policing the baseline for hostile environment claims. And we accept, as a general proposition, that not every such claim premised on staring or leering in the workplace automatically presents a question for the jury.

515 F.3d at 50 (citation and internal punctuation omitted). The question of the adequacy of a plaintiff's proffered evidence of constructive discharge has been decided many times in connection with a motion for summary judgment. *E.g., Lee-Crespo v. Schering-Plough Del*

---

[15] This argument is somewhat undermined by the plaintiff's insistence elsewhere in her memorandum of law that her resignation before June 21, 2006, was "equivocal," and that she understood that she could rescind her notice at any time up to July 1, 2006, the effective date given on her written notice. Opposition at 11. She takes the position that she ended her employment on June 21, 2006 because Watkins informed her that day that the defendant "had decided to return Mr. Pettengill to work on her shift." *Id*. This presentation certainly suggests that the plaintiff did not find her working conditions intolerable until she learned of Pettengill's return on June 21, 2006, but the defendant does not make this argument.

[16] The plaintiff's assertion that "[t]he same standard applies under the Maine Human Rights Act[,]" citing *King v. Bangor Fed. Credit Union,* 611 A.2d 80, 82 (Me. 1992), Opposition at 22 n.8, to the extent that it is meant to apply to her claim that the issue of constructive discharge must be resolved by trial, is also incorrect. The Law Court does not make such a suggestion in its opinion.

*Caribe Inc.*, 354 F.3d 34, 38, 45-46 (1st Cir. 2003); *Dykstra v. First Student, Inc.*, 324 F.Supp.2d 54, 67-68 (D. Me. 2004).

The plaintiff cites *Marrerro v. Goya of Puerto Rico, Inc.*, 304 F.3d 7 (1st Cir. 2002), as being consistent with the facts that she has presented in this case. Opposition at 22-23. In that case, the plaintiff's supervisor had constantly subjected her to sexual comments, often accompanied by lascivious looks and offensive gestures; contrived to bump into her frequently; rubbed his body against her several times; resumed this conduct after she confronted him, accompanied by more vulgar comments and criticisms of her work in front of others; often gave her extra work just as she was leaving for the day so that she had to work extra hours without pay for overtime; changed her lunch hour so that she was forced to work more than five hours without a break while knowing that she was hypoglycemic; and refused to let her use the bathroom. 304 F.3d at 14-15. After a few months, the plaintiff had difficulty concentrating on her work and then suffered a nervous breakdown. *Id.* at 15. Her performance evaluations had dropped from "excellent" to "regular." *Id.* at 20. She returned to work but after seven more months of similar treatment suffered another emotional breakdown. *Id.* at 15. She again returned to work, again was subjected to her supervisor's harassment, and after approximately a month, was told by her supervisor that "if you don't do the things I tell you and order you to do I am going to fire you." *Id.* She reported this incident to her employer, went on sick leave, and filed a charge with the EEOC. *Id.* at 15-16. When she returned to work, she was transferred to a different supervisor but her desk was located near her original supervisor's work station. *Id.* at 16. The former supervisor stared at her, made faces, and laughed at her. *Id.* She left work after two days and gave notice of her resignation approximately four months later. *Id.*

The plaintiff repeatedly complained about the harassment to the employer, but nothing was done until she filed a charge with the EEOC.  *Id*. at 28.  Even then, the employer transferred the plaintiff but took no action against the harasser.  *Id*.  It refused the plaintiff's request that she be transferred to a different building.  *Id*. at 29.

The question whether an individual has been subjected to a work environment sufficiently humiliating or abusive that a reasonable person in that individual's position would have felt compelled to resign "must be answered by reference to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Dykstra*, 324 F.Supp.2d at 67-68 (citation and internal punctuation omitted).  The standard is an objective one; the employee's subjective perceptions do not govern.  *Lee-Crespo*, 354 F.3d at 45.  "It is not enough that a plaintiff suffered the ordinary slings and arrows that workers routinely encounter in a hard, cold world."  *Id*. (citation and internal punctuation omitted).

The plaintiff offers the following as sufficient evidence to allow a reasonable factfinder to conclude that a reasonable person in her shoes would have felt compelled to resign on June 21, 2006:

> [Mr. Pettengill] repeatedly touched [the plaintiff] in an inappropriate and sometimes aggressive manner.  He repeatedly made sexual comments to her.  He abused his authority as a Team Leader in order to retaliate against her for rejecting his advances.  He spread false rumors about a sexual relationship between him and Ms. Scarborough.  His harassment even spilled out of the workplace when he followed Ms. Scarborough after work because she refused to have sex with him in the woods.
>
> Despite Ms. Scarborough's repeated complaints to management – and the fact that HR determined that Mr. Pettengill created a hostile work environment – the Defendant did not discipline Mr. Pettengill for what he did to Ms. Scarborough.  The Defendant's inaction emboldened Mr.

21

Pettengill.     Ms.  Scarborough's  co-workers  also  interpreted  the
Defendant's  inaction  to  mean  that  Ms.  Scarborough  had  filed  an
unmeritorious  complaint  against  Mr.  Pettengill.    As  such,  when  Mr.
Pettengill began to spread humiliating and false rumors about a sexual
relationship between Ms. Scarborough and him, her co-workers believed
him and began to alienate Ms. Scarborough. Since it was widely known
that Ms. Scarborough's long time domestic partner also worked at the
plant, these employees also thought that Ms. Scarborough was cheating
on him.  By the time the Defendant finally took some action against Mr.
Pettengill and terminated him in June 2006 it was too late.  Indeed, when
the Defendant decided to reinstate Mr. Pettengill just a couple [of] weeks
after  his  termination,  it  eviscerated  any  remedial  effect  that  the
termination might have had.

The humiliation Ms. Scarborough experienced because of the false
rumors  Mr.  Pettengill  spread  is  particularly  important.  .  .  .  Ms.
Scarborough  learned  that  her  supervisors  were  gossiping  about  her
sexual harassment complaint when Mr. Koczkodan told her that he knew
about it. . . .

The hostile environment that Mr. Pettengill and the Defendant created
for Ms. Scarborough upset her greatly.  She was particularly humiliated
by  the  rumors  that  were  circulating  around  the  workplace.    She
experienced so much distress that she had trouble sleeping and eating.

Opposition at 22-24 (factual assertions without support in the plaintiff's statement of material

facts and legal arguments and conclusions omitted).[17]   These factual assertions, even with the

favorable interpretation with which the plaintiff has endowed them, and even assuming that the

defendant may be held liable for all of Pettengill's alleged actions notwithstanding that he was

not a supervisory employee, do not rise to the level of the harassment recorded in *Marrerro*.

---

[17] For instance, the plaintiff proffers evidence that, after she resigned, Pettengill continued to make offensive sexual
comments in the workplace and to spread rumors about her for the proposition that "had [she] not resigned, it is
likely that she would have continued to experience the same humiliation and alienation that she experienced while
she worked there."  Opposition at 24.  Her conclusion does not follow from her factual premise, given that she has
not proffered evidence to show that, had she remained at her position, Pettengill would have continued to work in
the same building or otherwise have had daily access to her workplace.  She admits that, as of June 21, 2006, she
"would have been content for Pettengill to continue working at the Plant as long as she did not have to have
anything  to  do  with  him,"  Defendant's  SMF  ¶  75;  Plaintiff's  Responsive  SMF  ¶  75,  and  her  denial  of  the
defendant's assertion that "Watkins would have told Scarborough [on June 21, 2006] that Pettengill had been
instructed to take his breaks and to punch in and out at the far side of the warehouse while she remained employed at
the plant, so she and he would have no opportunity for any contact whatsoever," *id*. ¶ 57, is ineffective for the
reasons set forth in footnote 4 *supra*.

"To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992) (cited with approval in *Marrerro*, 304 F.3d at 28). Here, the plaintiff has offered no evidence that her work performance was affected in any way by the alleged events, one of the four elements listed in *Dykstra* to be considered in evaluating a claim of constructive discharge. The rumors and perceived alienation which so upset the plaintiff were not reasonably within the control of the defendant and cannot reasonably be characterized as anything other than "the ordinary slings and arrows that workers routinely encounter in a hard, cold world." *Lee-Crespo*, 354 F.3d at 45. Some of Pettengill's alleged conduct was "mere offensive utterance;" assuredly, some of it was humiliating, but it was not, as reported, physically threatening. This is not to say that any of it was acceptable or even that it might not have created a hostile working environment. Nor is it an endorsement of the defendant's alleged lack of an appropriate response to the plaintiff's complaints. It is merely to say that, applying the *Dykstra* paradigm, considering the frequency of the alleged harassment, its severity, its nature, and whether it unreasonably interfered with the plaintiff's work performance, on the evidence presented by the plaintiff, even with the benefit of all reasonable inferences in her favor, the plaintiff has not presented sufficient evidence of constructive discharge to allow her to present that claim to the factfinder in this case.

The defendant is entitled to summary judgment on the plaintiff's claim of constructive discharge.

## IV.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion for partial summary judgment be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 30th day of October, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge